IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JERRY LEE COOPERWOOD                                                                    PLAINTIFF

v.                                        No. 4:05CV00902 JLH

MARK WAGES, in His Individual Capacity                                                  DEFENDANT

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Jerry Lee Cooperwood was the subject of misdemeanor warrants for resisting arrest and fleeing and for failure to pay child support when Officer Mark Wages of the Kensett Police Department attempted to arrest him at approximately 2:00 a.m. on March 4, 2005. The attempted arrest took place on the carport of the home of Neita Cooperwood, Jerry Cooperwood's sister. Wages knew that Jerry Cooperwood was prone to flee, so when he began to arrest Cooperwood, he reached out with his left hand and grabbed Cooperwood by the shoulder. A struggle then ensued. Cooperwood attempted to free himself from Wages's grip. With his right hand, Wages unholstered his baton and struck Cooperwood on the leg. During the struggle, Wages also struck Cooperwood across the arms and upper torso. At some point during the struggle, Cooperwood grabbed the baton. Cooperwood testified that he grabbed the baton in an effort to stop Wages from hitting him with it. Wages testified that Cooperwood took the baton from him and then came toward him, screaming, with the baton raised in a threatening manner. According to Wages, he (Wages) then drew his firearm and fired. In an interview given on the morning of the incident, Wages stated, "I drew my service revolver and shot twice striking Jerry as he was coming at me. He was approximately three or four feet from me." In an interview approximately three weeks later, Wages stated, "I threw my left arm up in the air and may have closed my eyes, drew my weapon and shot from the hip twice." At trial, Wages testified that he was in a crouched position and shot from the hip.

Cooperwood contends that, when he broke free from the grip of Wages, the baton fell between them, and he fled. He contends that Wages shot him in the back. Cooperwood asserts that Wages used excessive force and therefore committed an unreasonable seizure of his person in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States. He brings this action pursuant to 42 U.S.C. § 1983.[1]

I.     **IT IS MORE PROBABLE THAN NOT THAT COOPERWOOD ATTEMPTED TO FLEE AND WAS SHOT IN THE BACK.**

From a consideration of all of the evidence presented by both sides, the Court concludes that it is more probable than not that, when Cooperwood and Wages disentangled, Cooperwood turned to flee and was shot in the back. It is more probable than not that Cooperwood did not come at Wages with the baton raised above his head as though he were going to strike Wages. The Court so concludes for the following reasons.

First, Cory Cooperwood testified that he came to the carport door during the altercation and saw Wages shoot Jerry Cooperwood. According to Cory Cooperwood, when Jerry Cooperwood and Wages disentangled, the baton fell onto the carport, and Jerry Cooperwood turned to flee. Then, Wages drew his firearm, aimed it with both hands extended in front of his body, and shot Jerry Cooperwood in the back. Jerry Cooperwood then turned "like he couldn't believe it," and Wages then shot a second time. According to Cory Cooperwood, Jerry Cooperwood turned to the left. After the second shot, Jerry Cooperwood stumbled and fell near the end of the carport.

Cory Cooperwood had a clear, unobstructed view. He testified calmly, with confidence and

---

[1] Cooperwood initially brought claims against the City of Kensett and against Wages in his official capacity. The Court granted summary judgment in favor of the defendants on those claims. Cooperwood also brought a state-law claim against Wages for battery. Cooperwood orally dismissed that claim at trial. He also orally waived his claim for punitive damages.

conviction, in such a manner that the Court believed that he was testifying truthfully.

Cory Cooperwood's account is confirmed by other important facts. First, according to Cory Cooperwood, Wages held the firearm in both hands with his arms extended in a manner that would have caused the bullets to travel more or less horizontal to the ground. One of the bullets struck Jerry Cooperwood slightly to the left of the spine, several inches above the waistline, traveled through the abdomen, and exited his right side. Photographs of the entry point and the exit point show that the bullet traveled approximately horizontal to the ground, and the surgeon who operated on Jerry Cooperwood testified that the bullet that entered the back and exited the abdomen traveled a horizontal path. Both bullets hit Jerry Cooperwood's torso at a height consistent with Cory Cooperwood's testimony that Wages held the firearm in both hands with arms extended when he fired.

On Wages's account, he fired from the hip while in a crouched position. From his demonstration in the courtroom, the Court estimates that his firearm would have been approximately 30 inches off the ground at the time he fired, if he fired in that position. Wages says that he fired twice in rapid succession. Both bullets entered Jerry Cooperwood's body several inches above his waist, approximately four feet from the ground. On Wages's account, both bullets would have traveled in an upward direction, not parallel to the ground.

The Court cannot determine with certainty the trajectory of the bullet that hit Jerry Cooperwood in the left front portion of his torso. That bullet fractured the left fourth, fifth, and sixth ribs, left a metallic trail of material extending at an oblique angle into the lower chest consistent with gunshot residue, and was later found under the skin of his left shoulder. That bullet may have struck Cooperwood's ribs while he was erect and been deflected; it may have struck the ribs while he was falling; or it may have struck the ribs and been deflected while he was falling. However, the bullet

that entered the back to the left of the spine and exited on the right side of the abdomen was not deflected off-course. That bullet traveled parallel to the ground, in a horizontal course, which is consistent with the testimony of Cory Cooperwood but inconsistent with the testimony of Wages.

Furthermore, both bullets struck Jerry Cooperwood's torso at approximately the same height. If Wages had fired two shots from the hip in rapid succession, as he testified, according to plaintiff's expert witness the "kick" from the firearm would have forced Wages's hand upward as he fired the second shot. Therefore, if Wages shot twice in rapid succession from the hip, the second shot would have struck Cooperwood at a point higher than did the first bullet.[2] However, one shot did not strike at a point higher than the other.

Wages testified that immediately after the shooting he ran to Jerry Cooperwood, and Cooperwood said, "Why did you shoot me in the back?" That remark was an unpremeditated, spontaneous statement spoken almost immediately after the shots were fired and before Jerry Cooperwood would have had the opportunity or the wherewithal to fabricate a story. The question – "Why did you shoot me in the back?" – is the reaction of a man who was trying to run away when he was shot, not the reaction of a man who was attacking with a baton when he was shot. A man who took a baton away from a policeman and then ran toward the policeman with the baton raised over his head in an aggressive fashion immediately before being shot by the policeman would not be likely to ask immediately after being shot, "Why did you shoot me in the back?"

Furthermore, it is undisputed that Jerry Cooperwood fell near the end of the carport, which

---

[2] The only alternative would be to say that Wages fired the first shot and then aimed his firearm again before firing the second shot. That would account for the fact that both bullets hit Cooperwood's torso at the same height, but it would be inconsistent with Wages's testimony that he "may have had his eyes closed" and fired in rapid succession; and it still would not account for the fact that the bullet that hit Cooperwood in the back traveled horizontally, not in an upward path.

would be more than fifteen feet from the location of Wages when the shots were fired.[3] On Wages's account, Jerry Cooperwood took a round from a .357 Magnum revolver fired into his rib cage from a distance of three or four feet, then he took another shot that passed through the abdomen, and then he walked or ran to the end of the carport. Wages stated, "Jerry then turned to run but collapsed at the flower bed and front yard." According to Cory Cooperwood, Jerry Cooperwood took another step after the first shot, and then after the second shot he stumbled and fell. Cory Cooperwood's testimony gives a more plausible explanation of how Jerry Cooperwood came to fall at the end of the carport.

In summary, the Court finds that it is more probable than not that Jerry Cooperwood was attempting to flee when he was shot in the back because Cory Cooperwood, the one eyewitness other than Jerry Cooperwood and Mark Wages, testified to that effect, and he was a credible witness; the trajectory of the one bullet that undoubtedly was not deflected from its course is consistent with Cory Cooperwood's description of the shooting and inconsistent with Wages's description of the shooting; that both bullets struck Jerry Cooperwood's torso at the same height several inches above the waist is consistent with Cory Cooperwood's account of how the shots were fired and inconsistent with Wages's account; the spontaneous, unpremeditated question by Jerry Cooperwood immediately after he was shot further confirms Cory Cooperwood's account and further disconfirms the account of Wages; and Cory Cooperwood's account offers a more plausible explanation of how Jerry Cooperwood came to fall at the end of the carport.

Miscellaneous other factual issues were hotly contested at trial. One of the issues had to do

---

[3] Some evidence indicates Cooperwood fell in the grass next to the driveway. If so, the distance could be twenty feet or more. The finding that Cooperwood fell fifteen or more feet from Wages takes the evidence in the light most favorable to Wages.

with the fact that Wages's baton was broken at the handle. No convincing explanation was offered by either side as to how the baton could have been broken. According to Wages, while he was firing the two rounds at Jerry Cooperwood, the baton came sailing over his head and crashed into the brick wall behind him. The defense contends that the baton was thrown with such force that hitting the brick wall caused it to snap. From the Court's inspection of the baton, if the baton had been thrown against the wall, it would have bounced off but would not have broken at the handle. Assuming that the baton was in good condition when the encounter between Mark Wages and Jerry Cooperwood began, nothing in the testimony offers a satisfactory explanation as to the cause of the break.[4]

The Court has seriously considered all of the evidence that was presented. Cooperwood offered evidence in addition to that mentioned above, but none of it forms a basis for the Court's findings. Wages offered evidence not mentioned above, but none of it was sufficiently credible or probative to overcome the conclusion stated above.

**II.    MARK WAGES IS NOT ENTITLED TO QUALIFIED IMMUNITY.**

Wages asserts that he is entitled to qualified immunity for his shooting of Jerry Cooperwood. Qualified immunity shields law enforcement officers from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). Qualified immunity is an affirmative defense on which the defendant carries the burden of proof. *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002). The purpose of qualified

---

[4] For the baton to break where it did – at the handle – would require the kind of pressure that would be exerted if one end had been placed on the carport and the other on a step while someone stepped on the handle, or if perhaps someone held the end opposite from the handle and struck the carport floor with the handle. No evidence shows that any such event occurred, so the case of the breaking of the baton remains unresolved.

immunity is to allow public officials to perform their duties in a manner they believe to be correct without fear for their own financial well being.  *Id*.  "Toward this end, the rule has evolved that an official performing discretionary functions will generally be immune from liability unless a reasonable person in his position would have known his actions violated clearly established law."  *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)).

"A court engaged in a qualified immunity inquiry uses a two-step process."  *Lawyer v. City of Council Bluffs*,  361 F.3d 1099, 1103 (8th Cir. 2004).  The first question is, taken in the light most favorable to the party asserting the injury, whether the facts alleged show that the official's conduct violated a constitutional right.  *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)).  If the facts, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right, the second question is whether the right was clearly established.  *Id*.

  **A.**  **The Use of Deadly Force against Jerry Cooperwood Was Objectively Unreasonable.**

"[A]n officer's use of force is not excessive under the Fourth Amendment if it was objectively reasonable under the particular circumstances."  *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005) (quotation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989).  "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the

reasonableness of the officer's conduct." *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003).

Wages used deadly force when he fired two rounds from his .357 Magnum revolver into Cooperwood's torso. Cooperwood could have died.

The Supreme Court explained when the use of deadly force is permissible in *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). In *Garner*, officers responded to a nighttime residential burglary. *Id*. at 3, 105 S. Ct. at 1697. One of the officers heard the backdoor of the house slam and saw someone run across the backyard. *Id*., 105 S. Ct. at 1697. The officer was "reasonably sure" that the person fleeing was unarmed. *Id*., 105 S. Ct. at 1697. After calling out "police, halt," the officer shot the fugitive in the back of the head before the fugitive was able to climb over the backyard fence and elude capture. *Id*. at 4, 105 S. Ct. at 1697. In finding a Fourth Amendment violation, the Supreme Court stated that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Id*. at 11, 105 S. Ct. at 1701. According to the Court, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id*., 105 S. Ct. at 1701. The Court held that burglary, although a serious crime, is not "so dangerous as automatically to justify the use of deadly force." *Id*. at 21, 105 S. Ct. at 1706. The Court limited the constitutionally permissible use of deadly force to two categories of police encounters: situations where "the suspect threatens the officer with a weapon" or situations where the suspect is escaping and "there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Id*. at 11, 105 S. Ct. at 1701. Thus, deadly force is constitutionally reasonable only "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."

*Id.*, 105 S. Ct. at 1701.

*Garner* controls here. Cooperwood was fleeing from Wages when Wages shot him in the back. Cooperwood was unarmed. The crimes that Wages had reason to believe that Cooperwood had committed – resisting arrest, fleeing on foot, and failing to pay child support – are much less serious than the nighttime residential burglary that the Supreme Court held in *Garner* did not justify the use of deadly force.[5] *Cf. Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993) (fugitive suspected of committing an armed assault). Furthermore, while Wages knew that Cooperwood had a history of running from the police, no evidence was offered that Cooperwood had a history of violence. *Cf. DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1011 (7th Cir. 2006) (officer knew suspect had a history of violence and perceived the suspect to be intoxicated); *Nelson v. County of Wright*, 162 F.3d 986, 990 (8th Cir. 1998) (officer knew that suspect "had been acting violent and suicidal"). Thus, when Wages shot Cooperwood, he had no reason to believe that Cooperwood was armed or dangerous.

Unlike the suspect in *Garner*, Cooperwood physically resisted arrest before fleeing. Cooperwood's resistance, however, does not justify the use of deadly force. The Court is certainly aware of cases holding that an officer may use a greater degree of force to attempt to gain compliance from a person who is resisting arrest. *See, e.g.*, *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006) (noting that, where a suspect resists arrest, "somewhat more force may reasonably be required" to effect the arrest); *Agee v. Hickman*, 490 F.2d 210, 212 (8th Cir. 1974) (force can be

---

[5] Both resisting arrest and fleeing on foot are misdemeanors under Arkansas law. *See* ARK. CODE ANN. §§ 5-54-103(a), 5-54-125. Wages asserts that Cooperwood was committing aggravated assault against him at the time the shooting occurred. However, according to Cory Cooperwood's account of the incident, which the Court has found to be the most credible account of the incident, no aggravated assault occurred because Cooperwood never threatened Wages with the baton or any other weapon. *See* ARK. CODE ANN. § 5-13-204(a).

used to overcome physical resistance). Wages's use of the baton to strike Cooperwood on the legs, arms, and shoulders was a reasonable use of force. However, Wages has not cited, and the Court has not found, a case that holds that an officer may use deadly force against a suspect who is resisting arrest absent a movement by the suspect that could be reasonably interpreted by the officer as a serious threat to his safety. *Cf. Nelson*, 162 F.3d at 991 (suspect was reaching for officer's gun during struggle before officer shot the suspect). No such threatening movement occurred in this case. The only evidence that Wages was seriously threatened during the struggle was Wages's testimony that Cooperwood was threatening Wages with the baton when Wages shot him. The Court has found that testimony not to be credible.

Cooperwood's resistance was an effort to break loose and flee, not an effort to injure Wages. Wages himself testified that he initiated physical contact with Cooperwood by grabbing Cooperwood because he was afraid that Cooperwood would flee. Wages also testified that Cooperwood never hit him while they were struggling. As Cory Cooperwood described it, and as the Court has found, when the two disentangled, the baton fell to the carport, and Jerry Cooperwood turned to flee. That Cooperwood resisted arrest prior to fleeing does not take this case outside the holding of *Garner*.

Neither does the fact that the events unfolded quickly justify Wages's use of deadly force. Wages asserts that the officer in *Garner* had more time to deliberate than Wages did here. While that may or may not be true,[6] it is only part of the calculus in determining whether the officer had probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, such that using deadly force is constitutionally permissible. Here, Cooperwood turned

---

[6] It is unclear from reading the Supreme Court's opinion in *Garner* just how quickly events unfolded prior to the officer shooting the fleeing suspect. *See Garner*, 471 U.S. at 3-4, 105 S. Ct. at 1697.

to flee and then was shot. Unless one believes that Wages shot from the hip with his eyes closed and hit Cooperwood twice in the torso – which the Court does not believe – then Wages could see that Cooperwood was fleeing and could have decided not to shoot.

The cases cited by Wages do not require a contrary conclusion. Those cases involved the use of deadly force against a suspect who had made a move that the shooting officer could reasonably interpret as a serious threat to his safety. *See Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th Cir. 2002) (officer could not see suspect's right hand and suspect rotated left shoulder consistent with drawing a weapon); *Thompson v. Hubbard*, 257 F.3d 896, 898 (8th Cir. 2001) (suspect "moved his arms as though reaching for a weapon at waist level"); *Nelson*, 162 F.3d at 991 ("It is not disputed that during the struggle, [the suspect] reached for [the officer's] gun and shoved [the officer] onto the floor and into the closet."); *Krueger*, 991 F.2d at 439 (suspect appeared to pull a knife from his waistband); *Jones v. City of St. Louis*, 92 F. Supp. 2d 949, 953 (E.D. Mo. 2000) (suspects shot at officers). Those cases apply the principle that an officer need not "wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw" a deadly weapon. *Thompson*, 257 F.3d at 899. While the officer need not see an actual weapon, he must at least observe the suspect move in a manner that could be reasonably interpreted as going for a weapon. Here, Cooperwood was fleeing when Wages shot him, and no evidence suggests that as he fled he made any movement that could reasonably be interpreted as going for a weapon. The assertion that Wages shot Cooperwood while Cooperwood was coming at him with the baton raised is contrary to the greater weight of the evidence. None of the cases cited by Wages is contrary to the Court's holding that Wages violated Cooperwood's Fourth and Fourteenth Amendment rights when Wages shot Cooperwood in the back as Cooperwood was running away.

**B.    A Reasonable Law Enforcement Officer on March 4, 2005, Would Have Known That It Was Unconstitutional to Use Deadly Force to Apprehend a Misdemeanor Suspect Who Did Not Pose a Threat to the Officer or Anyone Else.**

Wages argues that, even if he violated Cooperwood's constitutional rights, a reasonable officer in his position would not have known that his use of his service revolver would violate Cooperwood's constitutional rights. "Qualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004). To determine if a reasonable officer would have known his actions to be unlawful, the "dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).

The holding of *Garner* is clear and has been established law for over twenty years: an officer may not shoot a fleeing criminal suspect absent "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11, 105 S. Ct. at 1701. As was discussed above, Cooperwood did not threaten Wages with serious physical harm. Nothing that Wages knew about Jerry Cooperwood's past gave any indication that Jerry Cooperwood was a violent individual. Wages did know, however, that Cooperwood had a tendency to flee arrest. Cooperwood's resistance was an effort to avoid arrest, not an effort to injure Wages. In fact, it is undisputed that Cooperwood never hit Wages. Cooperwood was running away from Wages when Wages shot him. A reasonable officer in Wages's position would have known that shooting Cooperwood as he was running away violated the law as clearly established in *Garner*.

In summary, Wages violated Cooperwood's constitutional rights under the Fourth and

Fourteenth Amendments when he shot Cooperwood in the back as he was fleeing. Because a reasonable law enforcement officer would have known that shooting Cooperwood as he was fleeing violated Cooperwood's constitutional rights, Wages is liable to Cooperwood for his conduct.

## III.   DAMAGES.

The Supreme Court has held that 42 U.S.C. § 1983 creates a species of tort liability in favor of persons whose constitutional rights have been violated. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305-06, 106 S. Ct. 2537, 2542, 91 L. Ed. 2d 249 (1986). Therefore, "the level of damages is ordinarily determined according to principles derived from the common law of torts." *Id.* at 306, 106 S. Ct. at 2542. According to principles derived from the common law of torts, the damages recoverable in a case of this sort would include out-of-pocket loss, such as medical expenses, other monetary loss, physical pain and suffering, and mental and emotional distress. *Coleman v. Rahija*, 114 F.3d 778, 786-87 (8th Cir. 1997). *Cf.* 8th CIR. CIVIL JURY INSTR. 4.50A (2005).

The exhibits received into evidence include the following medical bills:

| | |
|---|---:|
| White County Medical Center | $102,806.83 |
| White County Medical Center | 63,574.33 |
| Searcy Medical Center | 12,666.00 |
| North Star EMS | 556.50 |
| Anesthesia & Pain Management Ass'n | 2,696.00 |
| The Lab of Path, P.A. | 946.00 |
| Radiology Associates, P.A. | 1,723.00 |
| Radiology Associates, P.A. | 979.00 |
| Lowry Drug | 7.57 |
| Lowry Drug | 42.58 |
| Lowry Drug | 14.55 |
| County Drug | 14.55 |
| TOTAL MEDICAL | $186,026.91 |

Some evidence indicated that Jerry Cooperwood may need surgery for a hernia repair related

13

to this incident, but no evidence was offered as to the cost of the potential hernia repair. The Court cannot determine the cost of any such hernia repair without speculation or conjecture. Likewise, some evidence indicates that Jerry Cooperwood may have lost wages in the past and may lose wages in the future, but no evidence was offered from which the Court could calculate lost wages, either in the past or in the future, without resort to speculation and conjecture.

The evidence established that Jerry Cooperwood has experienced pain and suffering and mental anguish as a consequence of being shot twice in the abdomen. The Court believes that a fair and reasonable amount to compensate him for that pain and suffering and mental anguish is $372,000.00. Total damages will be awarded in the amount of $558,026.91.

## CONCLUSION

From all of the evidence presented at trial, the Court finds in favor of Jerry Lee Cooperwood on his claim that Mark Wages, individually, violated his constitutional rights by using excessive force to seize him. Judgment will be entered in favor of Jerry Lee Cooperwood against Mark Wages on that claim in the amount of $558,026.91. All other claims asserted by Jerry Lee Cooperwood are dismissed with prejudice.

IT IS SO ORDERED this 25th day of January, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE